FILED

06/17/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2019 Session

## STATE OF TENNESSEE v. THOMAS BISHOP, DEVONTE BONDS, and JASON SULLIVAN

**Appeal from the Criminal Court for Knox County
Nos. 100194A, 100194B, 100194C      Bob McGee, Judge**

### No. E2018-00283-CCA-R3-CD

In this consolidated appeal, the Defendants, Thomas Bishop, Devonta Bonds, and Jason Sullivan, were convicted by a Knox County Criminal Court jury of attempted second degree murder, a Class B felony, aggravated assault, a Class C felony, and possession of a firearm during the commission of a dangerous felony, a Class D felony.[1] *See* T.C.A. §§ 39-13-210 (2010) (subsequently amended) (second degree murder), 39-12-101 (2010) (subsequently amended) (criminal attempt), 39-13-102 (Supp. 2011) (subsequently amended) (aggravated assault), 39-17-1324 (2010) (subsequently amended) (firearm possession). The jury likewise determined that the Defendants committed a criminal gang offense, enhancing by one level the felony classifications of the attempted second degree murder and aggravated assault convictions. *See id*. § 40-35-121 (2010) (subsequently amended). The trial court sentenced Defendant Bishop to thirty-two years for attempted second degree murder, to fifteen years for aggravated assault, and to five years for the firearm violation and ordered consecutive service of the attempted second degree murder and firearm sentences as required by law, for an effective thirty-eight-year sentence. The court sentenced Defendant Bonds to twenty years, to ten years, and to three years, respectively, and ordered consecutive service of the attempted second degree murder and the firearm sentences as required by law, for an effective twenty-three-year sentence. The court sentenced Defendant Sullivan to thirty-five years, to eighteen-years, and to five years, respectively, and ordered consecutive service of the attempted second degree murder and firearm sentences as required by law, for an effective forty-year sentence. The Defendants appealed, in relevant part, challenging the constitutionality of the criminal gang enhancement statute, and this court determined that the statute violated due process of law and remanded the case to the trial court for a new sentencing hearing "based solely on the underlying offenses." *See State v. Bonds*, 502 S.W.3d 118, 158, 167 (Tenn. Crim. App. 2016). Upon remand, the trial court sentenced Defendant Bishop to consecutive terms of sixteen years for attempted second degree murder,

---

[1] A fourth defendant, Briana Robinson, was likewise convicted of attempted second degree murder, aggravated assault and possession of a firearm during the commission of a dangerous felony at the joint trial. However, Defendant Robinson is not a party to this appeal.

eight years for aggravated assault, and five years for the firearm violation, for an effective twenty-nine-year sentence. The court sentenced Defendant Bonds to consecutive terms of ten years, five years, and three years, respectively, for an effective eighteen-year sentence. The court sentenced Defendant Sullivan to consecutive terms of sixteen years, eight years, and five years, respectively, for an effective twenty-nine-year sentence. On appeal, the Defendants contend that the trial court erred by imposing consecutive service of the attempted second degree murder and aggravated assault sentences. We reverse the judgments of the trial court and remand for the entry of modified judgments reflecting concurrent service of the attempted second degree murder and aggravated assault sentences in each Defendant's case. We likewise remand for the entry of a judgment relative to Defendant Sullivan's firearm violation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Wesley D. Stone, Knoxville, Tennessee, for the appellant, Thomas Bishop.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellant, Devonte Bonds.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Jason Sullivan.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald and Phillip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the May 30, 2012 attempted killing of Jonathan Dyer. In the previous appeal, this court summarized the trial facts as follows:

> On May 30, 2012, Jonathan Dyer was living with his girlfriend, Carnisha Dibrell, in Arbor Place Apartments on Townview Drive. Katherine White lived upstairs from the couple in the same apartment complex. That morning, Ms. White asked Mr. Dyer to take out his trash because she could smell it at her apartment, and she gave him a trash bag to do so. Mr. Dyer removed the trash and cleaned off his porch. Afterward, around 11:00 a.m., he went inside to brush his teeth and to prepare for a job interview. He also woke up Ms. Dibrell so that she could get ready to go to work.

Ms. White was sitting on the stairs outside of her apartment and smoking a cigarette when she saw a group of people approach and knock on Mr. Dyer and Ms. Dibrell's front door. Mr. Dyer and Ms. Dibrell heard the knock on the door, and Mr. Dyer shut the bedroom door before going to answer the front door. When Mr. Dyer opened the door, the defendants immediately entered the apartment. Ms. White saw Mr. Dyer let the group inside the apartment.

Mr. Dyer and the defendants were members of a street gang known as the Five Deuce Hoover Crips. Mr. Dyer knew the defendants, primarily, by their gang monikers: Defendant Bonds was known as "Lil Doozie"; Defendant Bishop was known as "Hoova T"; Defendant Sullivan was known as "Crank Deuce"; and Defendant Robinson was known as "Yella Deuce." Mr. Dyer's gang moniker was "J Hoover." Mr. Dyer knew Defendant Bonds the best of all the defendants because they grew up together, and Defendant Bonds's legal name was the only one of which Mr. Dyer was aware at that time. Mr. Dyer had only met Defendant Sullivan recently.

After entering the apartment, Defendants Bishop and Sullivan told Mr. Dyer that he needed "to put some money on [his] big homey, L.G.'s, books." Mr. Dyer refused this demand on the basis that fellow gang member L.G. was not his big homey; Mr. Dyer's big homey was another individual. Mr. Dyer explained that a "big homey" is a gang member who "calls the shots." A gang member under the authority of a "big homey" is called a "little homey," and a little homey must get the big homey's permission "to do something."

Defendant Bishop then accused Mr. Dyer of abandoning Defendant Robinson during a previous incident when someone fired a gun at her. Defendant Bishop indicated that Mr. Dyer's conduct was unacceptable because he had "left the home girl on stuck," meaning that Mr. Dyer "didn't defend her." Mr. Dyer maintained to the group that such an event had never happened and told them that Defendant Robinson was lying. Defendant Robinson "swore up and down that it did happen" and insisted, "Yeah, it did. You left me on stuck." Defendant Bishop reprimanded Mr. Dyer, chiding "these are the most precious things to us. You're supposed to hold it down, cuz. That's bogus." In making mention of "the most precious things," Defendant Bishop was talking about all female Crips. Mr. Dyer explained that, as a gang member, he was expected to "step up" and defend a fellow gang member if being threatened. Thus, if Defendant Robinson had been attacked, he would have had an obligation to protect her.

-3-

While in the bedroom during the confrontation, Ms. Dibrell heard a familiar male voice say, "These are the most precious B's in the world. . . . You ain't supposed to leave them like that. [They] are supposed to be protected." She then heard Mr. Dyer deny the accusations by responding, "No, that ain't what happened. That ain't what happened."

According to Mr. Dyer, failing to provide money for an incarcerated inmate and failing to protect a fellow female gang member could be potential grounds for a gang member to be expelled from the gang. The group surrounded Mr. Dyer against the wall leading into the kitchen of his apartment, and all of them "ganged" him, which meant that Mr. Dyer was "getting hands and feet put to" him. Mr. Dyer explained that receiving a gang beating or a fight is both the manner of initiation into the gang and expulsion from the gang. These rituals are known as "ganged in" and "ganged out." Mr. Dyer was ganged in to the gang when he was seventeen years old. During his initiation, Mr. Dyer was only ganged with fists, not feet, and he fought back against the gang members who were "jumping" him. There were no weapons during the initiation. Mr. Dyer did not need medical attention after he was ganged in. For this particular gang, the beating or fight is supposed to last for two minutes. However, on this occasion, Mr. Dyer did not remember having "too much of a chance to fight back." Mr. Dyer acknowledged that the beating he received was him being "ganged out" of the Five Deuce Hoover Crips and that he is no longer a member of the gang. Mr. Dyer testified that a gang member is also expected to fight back when he is ganged out. He was unaware of any gang member sustaining injuries as serious as he did while being ganged out.

Mr. Dyer remembered that Defendant Sullivan had a pistol "inside his front pocket," which Mr. Dyer described as a "little .22." Mr. Dyer could see the handle "hanging out," and he recognized the gun as belonging to Defendant Robinson. However, Mr. Dyer did not see Defendant Sullivan remove the weapon from his pocket, and as far as he knew, he had not been "pistol-whipped" with the gun.

From the bedroom, Ms. Dibrell heard a man "screaming" at Mr. Dyer, followed by loud yelling. The voice was so loud that Ms. Dibrell was "scared . . . a little bit." After "no longer than five seconds" of "scuffling" and "commotion," Ms. Dibrell went into the living room and saw Mr. Dyer on the floor. At that point, he was no longer being beaten. When Ms. Dibrell entered

the room, four individuals were looking at her, and she began to "fear for [her] life."

The attackers walked out of the apartment, but Defendant Bonds turned around and pushed his way back into the apartment as Ms. Dibrell tried to shut the front door. He retrieved a bottle of Sprite from the kitchen and left. Ms. Dibrell did not observe any of the attackers carrying a weapon of any type.

Out of the group, Ms. Dibrell recognized Defendant Bonds because she knew him well. She had seen Defendant Bishop at their apartment on previous occasions, but only knew him by his moniker. Ms. Dibrell gathered that the familiar voice she had heard in the bedroom was that of Defendant Bishop because she knew it was not Defendant Bonds's voice and because she did not know the other male in the group. The first person who walked out of the front door did not appear to be someone Ms. Dibrell knew, but she did not see that person's face.

Mr. Dyer was face down on the floor and would not respond to her. There was "so much blood on his face." His toothbrush was on the floor in the living room. Afraid that the attackers might still be outside, Ms. Dibrell said a prayer before she went outside and began screaming. She ran upstairs to get help from Ms. White and the other neighbors. Ms. Dibrell was "so scared" about Mr. Dyer's condition because he was unconscious and could not be roused.

Ms. White was still outside when Ms. Dibrell came out of the apartment screaming. Ms. White estimated that less than a minute had elapsed since the group entered the apartment. However, Ms. White did not notice the group leave. Ms. White went down to the apartment, looked inside through the front door, and saw Mr. Dyer on the floor.

After alerting Ms. White, Ms. Dibrell returned to her apartment and observed Mr. Dyer begin "shaking." She then called 911 from her apartment. Paramedic David Blanton responded to the emergency call. After entering the apartment, he observed Mr. Dyer unconscious on the floor and bleeding from his head. Mr. Dyer would not respond to attempts to revive him. Paramedic Blanton and his partner immobilized Mr. Dyer and carried him on a stretcher to their ambulance. They took him to the emergency room for trauma patients in critical condition.

The beating rendered Mr. Dyer unconscious and caused him to have body seizures. He remained in a medically-induced coma for nine weeks. A tracheotomy tube was inserted into Mr. Dyer's throat because he could not breathe without mechanical assistance. He needed rehabilitation to learn how to talk and walk again and to learn how to control his excretory functions. Mr. Dyer said that he was not in his "right state of mind" immediately after awaking from the coma. He began "hitting people" after he regained consciousness. Ms. Dibrell admitted that there were moments when Mr. Dyer's memory was "spotty" after he regained consciousness. At times, he did not recognize her. Mr. Dyer eventually normalized, but there are still some things that he does not remember. Mr. Dyer agreed that there are gaps in his memory about what happened to him after he awoke from the coma. At the time of trial, Mr. Dyer was twenty-one years old.

Michael Washam of the Knoxville Police Department was an investigator in the Violent Crime Unit. When he arrived at Mr. Dyer's apartment, Mr. Dyer had already been taken to the hospital. Inside the apartment, Investigator Washam observed puddles of blood near and inside of the kitchen area.

Investigator Washam interviewed Ms. White about the incident and spoke to the apartment manager. Based on his conversations, Investigator Washam began looking for four black males and a black female. Ms. White testified that the men entered first, followed by the woman. The woman wore her hair in a ponytail. One of the other men had a short "fade" haircut. They did not appear to be carrying anything. Investigator Washam quickly identified Defendants Bonds and Robinson as potential suspects; Defendant Bishop became a suspect not long after the first two were identified as suspects.

On July 20, 2012, Investigator Washam went to the hospital and showed Ms. Dibrell a six photograph lineup. She identified Defendant Bishop. He showed her another six photograph lineup, and she identified Defendant Bonds. At the time she made those identifications, she had not discussed the incident with Mr. Dyer.

During this hospital visit, Mr. Dyer was "up and moving around . . . [but] he did not know who he was nor who [Investigator Washam] was and could not even name his girlfriend's name . . . ." Because of Mr. Dyer's mental state, Investigator Washam did not ask Mr. Dyer to identify his attackers.

-6-

On August 20, 2012, Investigator Washam returned to the hospital and presented Mr. Dyer with several six photograph lineups. Investigator Washam instructed Ms. Dibrell to leave the room while he asked Mr. Dyer about the lineups. Mr. Dyer identified Defendants Bonds, Robinson, and Bishop, respectively. Mr. Dyer did not make an identification in two additional lineups, neither of which contained a photograph of any of the defendants. He told Investigator Washam that Crank Deuce participated in the beating and that one of the men in the two lineups looked like Crank Deuce. However, because Mr. Dyer had only met Crank Deuce once or twice a few weeks before the beating occurred, Mr. Dyer said that he was "not a hundred percent sure" that Crank Deuce was in the lineups. Mr. Dyer asked Investigator Washam to bring additional lineups for him to review. Separately, Ms. Dibrell also identified Defendant Robinson in a lineup.

On August 25, 2012, after Mr. Dyer had been released from the hospital, Investigator Washam showed Mr. Dyer a different lineup. This time, Mr. Dyer affirmatively identified Defendant Sullivan as Crank Deuce.

On October 22, 2012, Investigator Washam showed Ms. White a six photograph lineup, and she identified Defendant Robinson. He showed her another lineup, and she identified Defendant Bishop. She could not identify anyone else in the group.

Detective Thomas Walker of the Knox County Sheriff's Office testified that Five Deuce Hoover Crips is a gang that operates in Knox County. The Hoover Groovers was the original gang name during the 1960s in California. The gang members commonly refer to the gang as "Groovin'" or "Groovers." Detective Walker confirmed that, in gang culture, a member known as "a big homey" is one who recruits members to the gang. The recruits are mentored or trained on gang life by the "big homey." The more recruits a "big homey" has, the more status he has within the gang. Aside from death, "beat outs" are a common way for gangs to expel or release members who want to leave. It is a "very violent" experience that "will result in some kind of major trauma" to the ex-member. Permanent injury serves as an enduring reminder of what happens if someone offends or forsakes the gang.

The Sheriff's Office keeps a log of all ingoing and outgoing mail to inmates in their custody. On December 14, 2012, at 4:50 a.m., a letter written by Defendant Sullivan was mailed to a Knoxville address. Defendant Sullivan signed the letter identifying himself as "Crank Deuce 52." Previously, on January 22, 2010, Defendant Sullivan sent another letter to the same

individual. The bottom of the letter displays the word "grooving" and the letters "MxHxL." The acronym stands for "much Hoover love." It is signed by "Crank Deuce." Defendant Bishop signed a letter as Hoova T, "Hoova" being short for Hoover.

Defendant Sullivan has a tattoo on his arm. It depicts four playing cards fanned out, each bearing the numeral two with one of the suits in a standard deck of playing cards; such a hand is known as a four of a kind. The tattoo reads "Deuce is Wild." The gang members also commonly refer to themselves as "The Deuces." Defendant Bishop has the phrase "Criminal Minded" on his forearms as well as a five on one forearm and a two on the other. Defendant Bonds has a tattoo on his neck that says "Five Two." The numbers allude to their gang's name which contains those numbers. Defendant Bonds also has a tattoo of a star, which in gang culture identifies that a gang member is with a particular "nation." Defendant Robinson has "Yella Girl," tattooed on her neck.

Lieutenant Stephen Patrick of the Knox County Sheriff's Office testified that he was the keeper of records for the jail. He explained that Knox County contracts with a private company to record and store all inmate telephone calls. Every inmate receives a twelve-digit pin number, which is required for the inmate to place a phone call. The phone pin number is associated with the inmate's identification number. The State played portions of numerous recorded phone calls made by the defendants while incarcerated.

On August 20, 2012, at 9:13 a.m., Defendant Bonds made a phone call to an unidentified recipient, during which he said:

> ["Tone"] keep telling everybody I'm locked up for attempted murder like he want[s] me to be locked up for attempted murder. I said to myself like, "Dude, you just don't know. Lil' Jonathan done woke up." . . . . If he were to press charges it would be aggravated assault and battery. Ain't no attempted murder. . . . Only thing is it would be extremely aggravated assault.

On February 28, 2013, at 6:40 p.m., Defendant Bonds made a phone call to an unidentified recipient, during which the following conversation transpired:

Defendant Bonds:   Listen.  Listen.  I need you all to make sure cuz is not coming.

[Redacted]

Defendant Bonds:   You got to make sure everything is everything, man.  'Cause if not, dude, I'm gone.  I'm gone.  I'm just gonna be gone for six years, but that's still a long time, man.

          . . . .

Defendant Bonds:   . . . . If he show[s] up, I'm gone for six years.

Other:             (Inaudible)

Defendant Bonds:   You hear me?

Other:             Yeah.  [Redacted] said he wasn't.

Defendant Bonds:   . . . . I need to know. I can't say too much over the phone, you hear me?

Other:             I know, okay.  So you need to talk to your daddy.

Defendant Bonds:   I'm telling—Look.  Listen.

Other:             I[] know what you're sayin', okay?

Defendant Bonds:   All right, I'm just making sure.  Because if everything go good, I will be walking.  I will be walking out [of] this jail on April 23rd.

Other:             Right.

Defendant Bonds:   Yeah, got to get this politicking the right way.  Got to get this stuff right, ASAP.

'Cause if everything go good, I'm walking out that courtroom.  My lawyer said, if cuz don't show up to court, I'm walking out that courtroom [on] April 23rd.   I'm walking out of this jail [on] April 23rd. . . .

. . . .

Defendant Bonds:   Yeah, my lawyer says, [if] Jonathan don't show up to court, I'm walking out of this court, I'm walking out of this jail [on] April 23rd.

Other:   Oh, okay.

. . . .

Defendant Bonds:   Hey, you coming to court, right?

Other:   . . . . I'm gonna try.  Yeah, I'm gonna tell my manager to approve it.

Defendant Bonds:   He need to approve it 'cause I need you there.   'Cause when I walk into the courtroom, I need you to nod your head yeah if he there, you know what I'm saying?  You hear me?

Other:   Uh huh.

Defendant Bonds:   'Cause you coming in from the outside, and you can see, you get what I'm saying?

Other:   Uh huh.

Defendant Bonds:   All right. And if he not there, you know, nod your head no 'cause I can't talk to you.  But don't make it obvious.   I'm gonna look at you.

On February 28, 2013, at 6:53 p.m., Defendant Bonds made a phone call to an unidentified recipient, during which the following conversation transpired:

Defendant Bonds: I been calling your phone. Is my daddy there?

Other: No, he left. . . .

Defendant Bonds: Ahh, damn. I just missed him.

. . . .

Defendant Bonds: . . . . I need him to make sure cuz don't show up.

. . . .

Defendant Bonds: . . . . If cuz don't show, man, it's good. But if he show, I'm gone for six for aggravated assault and then they gonna charge me six for another gun, which is at a hundred. I'm gonna end up doing at least eight, nine years. . . .

On March 4, 2013, at 9:45 a.m., Defendant Bonds made a phone call to his father, known to Mr. Dyer as "Big Doozie," during which the following conversation transpired:

Defendant Bonds: . . . . I was telling you to let you know and make sure cuz doesn't show up to court. 'Cause if [he] do, I'm gone for twenty years, man. . . .

. . . .

Defendant Bonds: . . . . See, n[*****] is gonna talk. See, he's gonna talk. . . .

Other: . . . . You dude ain't coming to court, know what I mean?

Defendant Bonds:   Dude ain't coming to court, and I'm good, man.  I go to trial next month on April 23rd.

Other:   Well, he ain't showed up when he's supposed to.

On January 5, 2013, at 7:46 p.m., Defendant Bishop made a phone call to an unidentified recipient, during which the following conversation transpired:

Defendant Bishop:   Hey, you get your letter from the homey?

Other:   Yeah, I been trying to look for that n[*****], man.  I couldn't even find that little n[*****].

Defendant Bishop:   You got that letter though?

Other:   Yeah.

. . . .

Other:   . . . . I've been trying to get in to little dude. . . .  I mean, he was on Facebook.  He was on Facebook so I was his friend on—I got into his friend on Facebook, and he's telling somebody he trying to heal or some s*** you know what I'm saying?  He's trying to recover or something.

Defendant Bishop:   All right, all right.  Well, you got him on the issue?

Other:   I ain't want to do it on Facebook, man.

Defendant Bishop:   All right. . . .  So, you on it then?

Other:   I'm on it. . . .

. . . .

-12-

Other: Yeah, I'm trying to see where he is, see where he located at or not, so I can go just go to his crib.

Defendant Bishop: Yeah, that's what's up.

On March 23, 2013, at 3:34 p.m., Defendant Bishop made a phone call to the same phone number, during which the following conversation transpired:

Defendant Bishop: Hey, hey, what's up, man? Yeah, you still be acting on that little situation?

Other: Yeah. Lil Cuz, J Hoover.

. . . .

Defendant Bishop: What's up with them, homey?

Other: I don't know. Motherf[*****], said he wouldn't [be] coming though. Said he wouldn't [be] coming[, that is] what's up. And I talked to K Groove, and K Groove said he wasn't coming too though.

In a phone call on January 23, 2013, at 1:27 p.m. to the same number, Defendant Sullivan was addressed as Crank Deuce, and the following conversation occurred:

Defendant Sullivan: . . . . You know what you were talking about the last time when he called you, right?
Other: Ahhh.

Defendant Sullivan: Just stay up on that and see what Lil Buddy talking about on the LC. You feel me?

Other: I've been hitting him up and s*** you know what I'm saying? I've been hitting

-13-

him up. I've been telling him I f[***] with. I have been telling him I f[***] with some more Groovers and s***[.]

Defendant Sullivan: Yeah, that's what's up. . . .

Other: He wanted me to come over. I had to get my car fixed. He wanted me to come over and chill with him. So me and G are going to go over there and kick it with him and s*** and holler at that n[*****] about that s***[.]

Defendant Sullivan: That's what's up. I see you. That's what's up because everything [is] lookin' goochy poochy. . . . We've got to make sure Lil Buddy don't come and don't do s*** like—he like—like word is. But then, you know Lil Buddy.

On February 20, 2013, at 7:29 p.m., Defendant Sullivan made another phone call to the same phone number, during which the following conversation transpired:

Defendant Sullivan: . . . . Hey, but you know that business that we—that cuz we've been hitting that groove on, right?

Other: Yeah, yeah, yeah.

Defendant Sullivan: Need to take care of, you know what I'm saying?

Other: Yeah, but you all hanging out. What you feelin'?

Defendant Sullivan: It's like, you know what I'm saying, it will be a no go if everything on that end don't show, you dig?

In a phone call on September 18, 2012, at 9:26 a.m., Defendant Sullivan identified himself as "Crank." During the conversation, he instructed

the other participant, "It ain't Crank Deuce no more—it's Deuce Man. They call me Deuce Man." Defendant Sullivan also declared his intention to "back[] all the way out [of] the gang . . . completely," going so far as to say that he would no longer wear the gang's colors of orange and blue.

On February 23, 2013, at 4:22 p.m., Defendant Robinson made a phone call to Mr. Dyer's "big homey," who goes by the moniker "Bucc-it," during which the following conversation transpired:

| Defendant Robinson: | Yeah. You know I go to court in April? |
|---|---|
| Other: | I know, and I'm on top of that too. |
| Defendant Robinson: | Yeah. |
| Other: | I can't find that n[*]gga. |
| Defendant Robinson: | Who? |
| Other: | I can't find him. |
| Defendant Robinson: | Who? Oh yeah, yeah, yeah. |
| Other: | Dude. |
| Defendant Robinson: | Yeah. Ahh, he ain't coming. |
| Other: | Oh, all right. |
| Defendant Robinson: | Yeah, everything is good on that. . . . |

After the conclusion of the State's case-in-chief, none of the defendants presented any proof.

*State v. Bonds*, 502 S.W.3d 118, 127-135 (Tenn. Crim. App. 2016).

## Original Sentencing Hearing

The parties did not present testimony at the sentencing hearing, and the Defendants did not make an allocution to the trial court.

-15-

A.    **Defendant Bishop**

The presentence report was received as an exhibit and reflected that thirty-year-old Defendant Bishop had two previous felony convictions, which involved controlled substances and weapons. Defendant Bishop declined to participate in the presentence investigation.

The State sought application of enhancement factors (1), (6), and (13). *See* T.C.A. § 40-35-114(1) (2010) (subsequently amended) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"); -114(6) ("The personal injuries inflicted upon . . . the victim [were] particularly great[.]"); -114(13)(C), (F) ("At the time the felony was committed, . . . the defendant . . . [was] [r]eleased on probation . . . [or] [o]n some form of judicially ordered release[.]"). The State argued that Defendant Bishop's criminal history supported application of factor (1), that the victim's injuries supported application of factor (6), and that Defendant's being on federal supervised release at the time of the present offenses supported application of factor (13). Relative to Defendant Bishop's previous convictions and supervised release from federal court, the State relied upon a trial exhibit reflecting that Mr. Bishop had three previous federal felony convictions. He had been convicted of possession with the intent to distribute five grams or more of cocaine, carrying a firearm during and in relation to a drug trafficking offense, and possession with the intent to distribute cocaine base. The State noted for the trial court that the sentence for the firearm conviction required consecutive service with the sentence for the attempted second degree murder conviction and requested that the court order consecutive service of the firearm sentence with an unrelated federal sentence. The State did not request consecutive service of the aggravated assault and attempted second degree murder sentences.

The trial court, after considering the trial evidence, the presentence report, and the arguments of counsel, determined that Defendant Bishop was a Range II, multiple offender. The court relied upon two previous drug-related felony convictions in order to establish the offender classification. The court, though, refused to make findings relative to whether Defendant Bishop had additional previous felony convictions and declined to apply enhancement factor (1). The court relied heavily upon factor (6) after finding that the victim was "grievously" injured and nearly died from his injuries. The court noted that the victim was in a coma for a protracted period of time and had to "restart" his life. The court applied factor (13) because Defendant Bishop had been on federal supervised release at the time of the offenses. The court stated that factor (13) weighed heavily against Defendant Bishop.

Although the trial court noted that Defendant Bishop intended to challenge the constitutionality of the gang enhancement statute, the court sentenced him to thirty-two years

-16-

for attempted second degree murder. The court imposed a fifteen-year sentence for the aggravated assault conviction. The court imposed a five-year sentence, the mandatory minimum, for the firearm conviction. Relative to consecutive service of the attempted second degree murder and aggravated assault convictions, the trial judge stated that "while I think probably consecutive sentencing can – an argument can be supported for it, in this case the Court does not find it to be compelling[.]" Therefore, the court ordered concurrent service of these sentences but required consecutive service of the thirty-two years at 35% and the five years at 100%, for an effective thirty-seven-year sentence.

## B.    Defendant Bonds

The presentence report was received as an exhibit and reflected that Defendant Bonds had received pretrial diversion as a juvenile for disorderly conduct, aggravated criminal trespass, and a "not defined" offense. He was later "dismissed" from diversion in the case related to the undefined offense. Defendant Bonds was age twenty-one at the time of the report and had completed the tenth grade. He reported dropping out of school in the eleventh grade. He reported good mental and physical health, first consuming alcohol at age seventeen, drinking alcohol on special occasions, first using marijuana at age fifteen, and using marijuana daily before his incarceration. Defendant Bonds was raised by his grandmother beginning at age six months because of his mother's substance abuse. He did not have a relationship with his mother, who was in prison. Defendant Bonds's father was serving a sentence on probation, and Defendant Bonds described their relationship as "sometimes." Defendant Bonds reported having two children, and his grandmother expressed concern about his "anger problems." Defendant Bonds had never been employed, although he owed child support.

The State sought the application of enhancement factors (1), (6), (8), (9), and (13). *See id.* § 40-35-114 (1), (6); -114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"); -114 (9) ("The defendant possessed or employed a firearm . . . during the commission of the offense[.]"); -114(13)(A) ("At the time the felony was committed, . . . the defendant . . . [was] [r]eleased on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony[.]"). The prosecutor argued that factor (1) applied based upon Defendant Bonds's admission that he had used marijuana daily since he was age fifteen, that factor (8) applied because the victim's injuries were particularly great, that factor (9) applied because Defendant Bonds had violated the conditions of the judicial diversion he previously received, that factor (9) applied only to the attempted second degree murder conviction because Defendant Bonds possessed a firearm during the commission of the offense, and that factor (13) applied because Defendant Bonds had been released on bond for an unrelated

reckless endangerment charge when the present offenses were committed.[2] The prosecutor did not present any argument regarding consecutive service of the attempted second degree murder and aggravated assault convictions.

The trial court, after considering the trial evidence, the presentence report, and the arguments of counsel, determined that Defendant Bonds was a Range I, standard offender. The court found that enhancement factor (1) applied, noting that Defendant Bonds had been released on bond for a reckless endangerment charge at the time of the present offenses and had a history of criminal "activity." The court found, though, that his criminal history was "fairly minor" and that a portion of the criminal activity occurred when he was a juvenile. The court applied factor (6) after finding that the victim's injuries were "horrific" and nearly fatal. The court stated that this factor weighed heavily against Defendant Bonds. The court applied factor (8) and found that Defendant Bonds was on bond at the time of the present offenses, had previously received the benefit of judicial diversion, and had continued to commit criminal offenses. The court applied factor (9) to the attempted second degree murder and aggravated assault convictions because the offenses did not require the possession of a firearm.

The trial court found, based upon the presentence report, that Defendant Bonds had a "problematic upbringing," that he had been removed from his mother's care when he was an infant, that he had no relationship with his mother, that he had an intermittent relationship with his father, and that he "developed . . . some sort of anger problem." The court found that Defendant Bonds was age twenty-one at the time of the presentence investigation. The court sentenced him to twenty years for attempted second degree murder, to ten years for aggravated assault, and to three years for the firearm violation. The court stated that "some argument could be made for consecutive sentencing" but that "in this case the better course of action" was to impose concurrent service of the twenty- and ten-year sentences at 30%. The court ordered consecutive service of the three-year sentence at 100%, as required by law, for an effective twenty-three-year sentence.

## C.    Defendant Sullivan

The presentence report was received as an exhibit and reflected that Defendant Sullivan was age thirty-five and had previous convictions for criminal trespass, eight counts of driving with a revoked license, possession of less than 0.5 gram of cocaine, criminal impersonation, joyriding, aggravated assault, three incidents of failing to exhibit a license on demand, misdemeanor possession of cocaine, two counts of causal exchange, driving without a driver's license, "counterfeit controlled substance," misdemeanor possession of a schedule II controlled substance, and four traffic-related offenses. Defendant Sullivan received

---

[2] Defendant Bonds pleaded guilty to reckless endangerment and received a two-year sentence.

probation for multiple convictions, and the report reflected that his probation for four misdemeanor offenses was revoked. Defendant Sullivan received a one-year community corrections sentence for the counterfeit controlled substance conviction, and the report reflected that community corrections was revoked, that he was placed on probation, and that his probation was likewise revoked. Defendant Sullivan received judicial diversion for misdemeanor possession of a schedule II controlled substance, and the report reflected that diversion was later revoked. Defendant Sullivan, likewise, had juvenile adjudications related to possession of a weapon with the intent to go armed, evading arrest, temporary taking of an automobile, a traffic-related offense, and undefined offenses. Defendant Sullivan received probation multiple times as a juvenile.

The presentence report reflected that during his confinement, Defendant Sullivan had infractions for assaulting staff, refusing to participate, two incidents of sexual misconduct, three incidents of creating a disturbance, disrespect, two incidents of being in an unauthorized location, drug possession, fighting, two incidents of interfering with officer duties, threatening an employee, refusing a direct order, possessing contraband, failing to report as scheduled, and violating Department of Correction policy. Defendant Sullivan reported completing the ninth grade, and the report reflected that he was working to obtain his GED. Defendant Sullivan reported having excellent physical and mental health, first drinking alcohol at age twelve, and drinking twelve beers daily at the time of his arrest. Defendant Sullivan reported that his drinking "caused problems" with his family and contributed to his criminal conduct. He reported that he smoked marijuana daily at age twelve and used cocaine weekly at age sixteen and that he used both drugs just before his arrest. Defendant Sullivan denied seeking substance abuse treatment but reported receiving treatment for anger management during the year leading up to his arrest. He reported a close relationship with his family, except his father, and an employment history from 1998 to 2000.

The State sought application of enhancement factors (1), (6), (8), (9), (11). *See id.* § 40-35-114 (1), (6), (8), (9); -114(11) (The conviction offense "resulted in death or serious bodily injury . . . to another person, and the defendant has previously been convicted of a felony that resulted in death or serious bodily injury[.]"). The prosecutor argued that factor (1) applied because Defendant Sullivan had multiple previous misdemeanor and felony convictions and because he admitted marijuana and cocaine use. The prosecutor argued that the victim's injuries were particularly great and that Defendant Sullivan received previous sentences of probation and community corrections that were revoked. The prosecutor argued that factor (9) applied because the victim testified at the trial that he saw the gun in Defendant Sullivan's pocket. The prosecutor argued that factor (11) applied because the victim suffered serious bodily injury and because Defendant Sullivan had been previously convicted of aggravated assault resulting in serious bodily injury. The prosecutor did not present any argument regarding consecutive service of the attempted second degree murder and the aggravated assault sentences.

The trial court found, after considering the trial evidence, the presentence report, and arguments of counsel, that Defendant Sullivan had a "very troubling" and "substantial criminal record" and was a Range II, multiple offender. The court determined that factor (1) applied because Defendant Sullivan had three previous felony convictions and that factor (6) applied based upon the victim's significant injuries and "great suffering." The court found that factor (8) applied because Defendant Sullivan's probation and community correction sentences had been revoked and because he continued to engage in misconduct when in confinement. The court found that during his confinement, Defendant Sullivan had engaged in disrespect, drug and contraband possession, fighting, threatening an employee, and two instances of sexual misconduct. The court found that Defendant Sullivan "continue[d] to be a dangerous offender, not in the technical sense of that word, but in the vernacular, he's a dangerous fellow who just keeps breaking the law." The court applied factor (9) to the second degree murder and aggravated assault convictions based upon the use of a firearm. The court also applied factor (11) based upon Defendant Sullivan's previous conviction for an offense involving serious bodily injury.

The trial court sentenced Defendant Sullivan to thirty-five years at 35% for attempted second degree murder and to eighteen years for aggravated assault at 35%. The court sentenced him to five years at 100% service for the firearm violation and ordered this sentence to be served consecutively to the thirty-five-year sentence as required by law. Relative to consecutive service of the attempted second degree murder and aggravated assault sentences, the court stated that Defendant Sullivan "comes a lot closer than the others . . . in justifying consecutive sentencing. Under the circumstances, although the crime of attempted second degree murder and the crime of aggravated assault are very different crimes, there is, nevertheless, one criminal episode involved, so this Court will . . . order the sentence[s] imposed . . . to run concurrently[.]" Defendant Sullivan received an effective forty-year sentence.

**Sentencing Hearing upon Remand**

The original 2013 sentencing transcript and presentence reports were incorporated into the record, along with addendums to the presentence reports. Although the parties relied upon their respective arguments from the original hearing, the State argued that consecutive service was warranted for each offense based upon new conduct occurring since the Defendants began serving their sentences in the Department of Correction. The prosecutor argued that the information supported the conclusion the Defendants were dangerous offenders and that an extended sentence was necessary to protect the community. The prosecutor argued that consecutive service was also warranted for Defendant Bishop because he was on federal supervised release at the time of the present offenses. The prosecutor relied upon the enhancement factors from the original sentencing hearing and made no

additional arguments in this regard. The Defendants opposed consecutive service, arguing that the State's information in the addendums was irrelevant, that the addendums were not the best evidence, and that no basis existed to support consecutive sentencing.

Tennessee Department of Correction Special Agent Aaron McPeters testified that he worked in the security threat group for East Tennessee. He said that he received training in "gang identification." He said that a validation process was used to confirm that a person was affiliated with a gang, that information and evidence were assigned points, and that after a certain number of points, the person's gang affiliation was confirmed. Mr. McPeters stated that the Department of Correction had confirmed Defendant Bonds belonged to the Vice Lords street gang, based upon information and evidence obtained since Defendant Bonds began serving his sentence. Mr. McPeters stated that the Department of Correction had, likewise, confirmed Defendants Sullivan and Bishop belonged to security threat group Crips street gang.

On cross-examination, Mr. McPeters testified that cell phone use in prison was a common attribute of gang activity but conceded that not all cell phone use was attributable to gang activity. He said that, generally, "refusal to participate" indicated the inmate did not comply with an order given by security staff and was not attributable generally to gang-related activity. He agreed that contraband in a prison was not limited to controlled substances and said items such as cigarettes were considered contraband. He also agreed that tampering with security equipment and assault were not solely committed by inmates who were gang members.

Mr. McPeters testified that he did not investigate the assault referenced in the presentence report addendums, although Defendant Sullivan pleaded guilty to assaulting Defendant Bonds. Mr. McPeters did not know the circumstances of the drug possession and defiance disciplinary matters referenced in the addendum relative to Defendant Sullivan. Mr. McPeters agreed that Defendant Bonds sustained minor injuries from the assault.

Mr. McPeters testified that the violation of Department of Correction policy referenced in the addendum relative to Defendant Bonds could have been for failure to make his bed each morning. Mr. McPeters agreed that the failures to report and to participate referenced in the addendum could have been Defendant Bonds's refusal to attend school on time. Mr. McPeters said that Defendant Bishop pleaded guilty to assaulting Defendant Bonds.

A.    **Defendant Bishop**

The presentence report addendum reflected that the Department of Correction had confirmed that Defendant Bishop was a Crips gang member. It also showed that, since the

-21-

original sentencing hearing in 2013, Defendant Bishop had committed multiple disciplinary infractions, including possessing or using a cell phone, refusing to participate, possessing contraband, participating in two security threat group acts, failing to report as scheduled, tampering with security equipment, creating a disturbance, and assault.

The trial court stated that, in determining Defendant Bishop's sentences, it had not "attempted to follow any logical or systemic relationship" with the sentences previously imposed. The court determined that the injuries inflicted upon the victim were particularly great, noting that the victim was placed in a medically-induced coma for nearly nine weeks and that the victim had to relearn how to talk, to walk, and to control his bodily functions. The court found that Defendant Bishop was on federal supervised release at the time of the offenses in this case. The court sentenced Defendant Bishop as a Range II offender to sixteen years for attempted second degree murder, to eight years for aggravated assault, and to five years for the firearm violation.

The trial court, likewise, found that Defendant Bishop was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing an offense in which the risk to human life was high. The court found that Defendant Bishop acted as an enforcer for a criminal gang. The court determined that the circumstances surrounding the commission of the offenses were aggravated due to the extreme physical injury inflicted upon the victim and that confinement for an extended period of time was necessary to protect society from Defendant Bishop's unwillingness to lead a productive life. As a result, the court ordered consecutive service, for an effective sentence of twenty-nine years. The court determined that the aggregate length of the sentence was reasonably related to the offenses for which Defendant Bishop was convicted.

## B.  Defendant Bonds

The presentence addendum reflected that the Department of Correction had confirmed that Defendant Bonds was a Vice Lords gang member. It also showed that, since the original sentencing hearing in 2013, Defendant Bonds had committed multiple disciplinary infractions, including three incidents of refusing a cell assignment, refusing a direct order, two incidents of violating "institution policy," failing to report as scheduled, refusing to participate, disrespect, and mutilation.

The trial court stated that, in determining Defendant Bonds's sentences, it had not "attempted to follow any logical or systemic relationship" with the sentences previously imposed. The court determined that the injuries inflicted upon the victim were particularly great, noting that the victim was nearly beaten to death, was placed in a medically-induced coma for nine weeks, and had to relearn how to walk, to talk, and to control his bodily functions. The court found that Defendant Bonds had been released on bond at the time of

the present offenses. The court sentenced Defendant Bonds as a Range I offender to ten years for attempted second degree murder, to five years for aggravated assault, and to three years for the firearm violation.

The trial court, likewise, found that Defendant Bonds was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing an offense in which the risk to human life was high. The court determined that the circumstances surrounding the commission of the offenses were aggravated due to the extreme physical injury inflicted upon the victim and that confinement for an extended period of time was necessary to protect society from Defendant Bonds's unwillingness to lead a productive life. As a result, the court ordered consecutive service, for an effective sentence of eighteen years. The court determined that the aggregate length of the sentence reasonably related to the offenses for which Defendant Bonds was convicted.

## C. Defendant Sullivan

The presentence addendum reflected that the Department of Correction had confirmed that Defendant Sullivan was a Crips gang member. It also showed that, since the original sentencing hearing in 2013, Defendant Sullivan had committed three disciplinary infractions, including assault, possession or selling drugs, and defiance.

The trial court stated that, in determining Defendant Sullivan's sentences, it had not "attempted to follow any logical or systemic relationship" with the sentences previously imposed. The court determined that the injuries inflicted upon the victim were particularly great, noting that the victim was nearly beaten to death, was placed in a medically-induced coma for nine weeks, and had to relearn how to walk, to talk, and to control his bodily functions. The court found that Defendant Sullivan had an extensive record of violating the conditions of release and had been previously revoked from probation four times and from community corrections. The court found, based upon his previous aggravated assault conviction, that Defendant Sullivan had been previously convicted of a felony involving serious bodily injury. The court sentenced Defendant Sullivan as a Range II offender to sixteen years for attempted second degree murder, to eight years for aggravated assault, and to five years for the firearm violation.

The trial court, likewise, found that Defendant Sullivan was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing an offense in which the risk to human life was high. The court determined that the circumstances surrounding the commission of the offense were aggravated due to the

extreme physical injury inflicted upon the victim and that confinement for an extended period of time was necessary to protect society from Defendant Sullivan's unwillingness to lead a productive life. The court found that Defendant Sullivan was an enforcer for a criminal gang. As a result, the court ordered consecutive service, for an effective sentence of twenty-nine years. The court determined that the aggregate length of the sentence reasonably related to the offenses for which Defendant Sullivan was convicted. This appeal followed.

The Defendants contend that the trial court erred by ordering consecutive service of the attempted second degree murder and aggravated assault sentences. They argue that the trial court erred by determining that they were dangerous offenders whose behavior indicated little or no regard for human life and that they had no hesitation about committing an offense in which the risk to human life was high. The Defendants also argue that, at the original sentencing hearing, the trial court declined to impose consecutive service and that no additional evidence was presented at the new sentencing hearing and relied upon by the trial court to support consecutive service. The Defendants do not challenge the length of their individual sentences, the consecutive service of the firearm and attempted second degree murder sentences, or the application of the enhancement factors. The State responds that the trial court's dangerous offender determinations are supported by the record, that the trial court did not vindictively impose consecutive service, and that the new evidence related to the Department of Correction infractions justified consecutive service.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, the abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive

sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2014); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Tennessee Code Annotated section 40-35-115(b)(4) states that a court may order a consecutive sentence if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." In addition, "the record must also establish that the aggregate sentence reasonably relates to the severity of the offenses and that the total sentence is necessary for the protection of the public from further crimes by the defendant." *Pollard*, 432 S.W.3d at 863; *see State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

The record reflects that, at the original sentencing hearing, the prosecutor did not seek consecutive service of the attempted second degree murder and aggravated assault sentences. In fact, the only references by the parties to consecutive service was that Defendant Bishop had been on supervised federal release at the time of the present offenses, that consecutive service of Defendant Bishop's sentence for the firearm violation and the federal sentence was required, and that consecutive service of the firearm and the attempted second degree murder sentences were required for each Defendant. The parties did not address consecutive service of the attempted second degree murder and aggravated assault convictions. In any event, the trial court considered whether to impose consecutive service of the attempted second degree murder and the aggravated assault sentences. Regarding Defendant Bishop, the trial judge stated, "[W]hile I think probably consecutive sentencing can – an argument can be supported for it, in this case the Court does not find it to be compelling[.]" Regarding Defendant Bonds, the trial judge stated that "some argument could be made for consecutive sentencing" but that "in this case the better course of action" was to impose concurrent service. Regarding Defendant Sullivan, the trial judge stated that Defendant Sullivan "comes a lot closer than the others . . . in justifying consecutive sentencing. Under the circumstances, although the crime of attempted second degree murder and the crime of aggravated assault are very different crimes, there is, nevertheless, one criminal episode involved, so this Court will . . . order the sentence[s] imposed . . . to run concurrently[.]" Therefore, based upon the record, which included the trial evidence, the presentence report, and the sentencing hearing evidence, the court determined consecutive service was not warranted. This changed at the sentencing hearing upon remand.

After this court determined that the gang enhancement statute violated due process and remanded this case for a new sentencing hearing, the State sought, for the first time,

-25-

consecutive sentencing of the attempted second degree murder and the aggravated assault sentencings. Specifically, the State relied upon the dangerous offender classification as the basis for consecutive service.

Regarding Defendant Bishop, the prosecutor argued that he was a dangerous offender based upon (1) the previously imposed federal sentence for which he was on supervised release at the time of the present offenses, (2) the severity of the victim's injuries, (3) his gang affiliation, and (4) his disciplinary infractions since the original sentencing hearing. The prosecutor argued that Defendant Bishop was dangerous, that he had demonstrated a refusal to "comply with rules," and that extended confinement was necessary to protect society.

Regarding Defendant Bonds, the prosecutor argued that he was a dangerous offender based upon (1) the reckless endangerment offense to which he pleaded guilty and received a two-year sentence, (2) the severity of the victim's injuries, (3) his gang affiliation before and after entering the Department of Correction, and (4) his disciplinary infractions since the original sentencing hearing. The prosecutor argued that Defendant Bonds had no regard for human life, that he had refused to conform his conduct to the rules of society, and that extended confinement was justified to protect society.

Regarding Defendant Sullivan the prosecutor argued that he was a dangerous offender based upon (1) his criminal history, (2) his disciplinary infractions before and after the original sentencing hearing, and (3) the severity of the victim's injuries. The prosecutor argued that Defendant Sullivan had no regard for human life, that he had refused to conform his conduct to the rules of society, and that extended confinement was justified to protect society. The prosecutor also argued that consecutive sentences were warranted based upon Defendant Sullivan's extensive criminal history. *See* T.C.A. § 40-35-115(b)(2).

The trial court imposed consecutive service of the attempted second degree murder and the aggravated assault convictions based upon the dangerous offender classification. *See id.* 40-35-115(b)(4). The court determined that each of the Defendants was a dangerous offender based upon the severity of the victim's injuries. The court determined that each Defendant had no hesitation about committing an offense when the risk to human life was high, that extensive confinement was necessary to protect society from the Defendants' criminal conduct, and that the aggregate length of each Defendant's sentence was reasonably related to the conviction offenses. *See Pollard*, 432 S.W.3d at 863; *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

Although the Defendants argue that the victim's injuries were encompassed by the serious bodily injury required of aggravated assault, the record supports the trial court's determination that the injuries were egregious and went beyond that necessary to inflict

serious bodily injury. *See* T.C.A. § 39-11-106(34) (definition of serious bodily injury). The Defendants beat the defenseless victim severely, rendering him unconscious. The victim suffered seizures, was placed in a medically-induced coma for nine weeks, and could not breathe without undergoing a tracheotomy. After regaining consciousness, the victim had to relearn how to walk, to talk, and to control his bodily functions. The record generally supports the determination that the circumstances of the offenses were aggravated by the extensive injuries inflicted upon the victim. As a result, the imposition of consecutive service, generally, was not contrary to the principles of sentencing. However, the greater issue in this case is whether the imposition of consecutive service upon remand is presumptively punitive to the Defendants for successfully exercising the right to appeal the trial court's application of a sentencing enhancement statute later determined by this court to be unconstitutional.

The State argues that new evidence showing the Defendants' Department of Correction disciplinary infractions since the original sentencing hearing supported the imposition of consecutive service upon remand and that, as a result, "actual vindictiveness" was not the basis for imposing consecutive service. However, the trial court's sentencing order reflects that the Defendants' disciplinary infractions were not the basis for imposing consecutive service and that, as a result, the court implicitly determined that the disciplinary infractions and new criminal activity did not compel consecutive service. The court imposed consecutive service based upon the victim's extensive injuries, evidence of which was presented during the trial and known to the court at the time of the original sentencing hearing. At the original sentencing hearing, the trial court determined that while consecutive service could have been supported by the evidence, the arguments supporting consecutive service were not "compelling" and that the "better course of action" was to impose concurrent service. The court likewise noted that the offenses were the result of one criminal episode when deciding to impose concurrent service. Specific to Defendant Sullivan, we note that although the trial court found him to be a "dangerous fellow" who continued to break the law, the court stated that he was not "a dangerous offender . . . in the technical sense of that word, but in the vernacular." Therefore, the court determined that consecutive service was not warranted based upon the trial evidence, the presentence reports, and the sentencing hearing evidence.

In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the Supreme Court determined that due process required a trial court to provide reasons for imposing a harsher sentence upon remand from a higher court. The Court stated,

> A trial judge is not constitutionally precluded . . . from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life health, habits, conduct, and mental and moral propensities.'

-27-

Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources. The freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle . . . that a State may adopt the 'prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime.'

*Id*. at 723 (quoting *Williams v. New York*, 337 U.S. 241, 245-47 (1949)). Therefore, "While sentencing discretion permits consideration of a wide range of information relevant to the assessment of punishment, . . . it must not be exercised with the purpose of punishing a successful appeal." *Alabama v. Smith*, 490 U.S. 794, 798 (1989); *see Pearce*, 395 U.S. at 723-25; Williams, 337 U.S. at 245-49. In order to prevent punishing a defendant for a successful appeal, "whenever a judge imposes a more severe sentence upon a defendant [upon remand] . . . , the reasons for . . . doing so must affirmatively appear" in the record. *Smith*, 490 U.S. at 798; *Pearce*, 395 U.S. at 726. Without the trial court's reasoning for a harsher resentencing, "a presumption arises that a greater sentence has been imposed for a vindictive purpose – a presumption that must be rebutted by objective information . . . justifying the increased sentence." *Smith*, 490 U.S. at 798 (internal quotations and citations omitted). However, this presumption of vindictiveness does not apply in all cases. *See Smith*, 490 U.S. at 799-800 (determining that the *Pearce* presumption does not arise when a sentence imposed after a trial is harsher than a previously imposed sentence after a guilty plea); *Colten v. Kentucky*, 407 U.S. 104, 119-20 (1972) (determining that the *Pearce* presumption does not arise when a defendant who has been convicted and sentenced in an inferior court seeks a trial de novo in a court of general jurisdiction); *Chaffin v. Stynchcombe*, 412 U.S. 17, 18 (1973) (determining that the *Pearce* presumption does not arise when a defendant obtains appellate relief after a jury trial, and a second jury imposes a harsher punishment during a retrial). Therefore, the *Pearce* presumption applies to circumstances in which a "'reasonable likelihood' [exists] that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Smith*, 490 U.S. at 799 (internal citation omitted). The presumption, though, "may be overcome only by 'objective information . . . justifying the increased sentence.'" *Texas v. McCullough*, 475 U.S. 134, 142 (1986) (quoting *United States v. Goodwin*, 457 U.S. 368, 374 (1982)); *see State v. James M. Coggins, Jr.*, No. 01C01-9503-CR-00076, 1995 WL 649954, at *2 (Tenn. Crim. App. Nov 2, 1995). "Where there is no such reasonable likelihood, the burden remains on the defendant to prove actual vindictiveness." *Smith*, 490 U.S. at 799; *see Wasman v. United States*, 468 U.S. 559, 569 (1984).

A trial court's declining to impose consecutive service at an initial sentencing hearing but imposing consecutive service upon remand after a successful appeal is "a more severe

punishment." *Williams v. State*, 503 S.W.2d 109, 112 (Tenn. 1973); *James M. Coggins, Jr.*, 1995 WL 649954, at *2 (Tenn. Crim. App. Nov 2, 1995). *But see Jay Will Kilby v. State*, No. 03C01-9801-CR-00040, 1999 WL 447073, at *5 (Tenn. Crim. App. July 2, 1999) (concluding that the defendant did not receive a longer sentence after consecutive service was imposed upon resentencing because initially the defendant was sentenced in 1987 to six concurrent life sentences and became eligible for release after serving thirty years, but, when consecutive service was imposed in 1991, the defendant received an effective seventy-five-year-sentencing at 40% service and became eligible for release after serving thirty years). This court has stated that the "imposition of consecutive sentences for the first time at resentencing usually carries a presumption of vindictiveness" but that no per se rule exists creating the presumption without regard for the circumstances and facts of the case. *Jay Will Kilby*, 1999 WL 447073, at *5 n.3; *see James M. Coggins, Jr.*, 1995 WL 649954, at *2 ("A consecutive sentence is a more severe sentence than a concurrent sentence.").

The evidence upon which the trial court imposed consecutive service of the attempted second degree murder and aggravated assault sentences was not based upon evidence presented for the first time at the new sentencing hearing. Rather, the record reflects that the evidence relied upon by the court was known to it at the time of the original sentencing hearing and that the court determined this evidence was not a compelling reason to impose consecutive service. We agree with the Defendants that "the lawful exercise of an appellate right to test the constitutionality of a [statute] is not a compelling reason to order" consecutive service. The Defendants' criminal histories and gang affiliations and the extent of the victim's injuries were established at the trial, but it was not until the new sentencing hearing, at which the gang enhancement statute could not be applied, that the trial court determined that the Defendants were dangerous offenders warranting consecutive service. The court did not explain why the same evidence was not compelling to warrant consecutive service at the original sentencing hearing but warranted consecutive service upon remand. We conclude that the trial court erred by imposing consecutive service of the attempted second degree murder and the aggravated assault convictions in the Defendants' cases, and we remand these cases to the trial court for the entry of modified judgments reflecting concurrent service of the attempted second degree murder and aggravated assault sentences.

Likewise, because the record does not contain a judgment of conviction for Defendant Sullivan's firearm violation, we remand for the entry of a judgment reflecting the conviction and sentence.

In consideration of the foregoing and the record as a whole, we reverse the trial court's imposition of consecutive service of the attempted second degree murder and aggravated assault sentences. These cases are remanded for the entry of modified judgments reflecting concurrent service for these convictions and for the entry of a judgment reflecting Defendant Sullivan's firearm conviction and sentence.

_____
ROBERT H. MONTGOMERY, JR., JUDGE